(100 App. Div. 285)

### VROOM v. SAGE.

(Supreme Court, Appellate Division, First Department. January 6, 1905.)

1. TROVER AND CONVERSION—NEGOTIABLE INSTRUMENTS.

A written instrument giving the holder the right to call from or deliver to the maker specified stocks at fixed prices, which, pursuant to local custom, passed as negotiable paper, may be the subject of an action for conversion thereof.

2. SAME—EVIDENCE—SUFFICIENCY.

In an action for conversion of written instruments, giving the holder the right to call from or deliver to the maker specified stocks at fixed prices, which, pursuant to local custom, passed as negotiable paper, evidence *held* to show a conversion by defendant.

3. SAME—ACTUAL VALUE—EVIDENCE—ADMISSIBILITY.

Where there was no market value for certain written instruments at the time of their conversion, testimony of experts as to their actual value as a subsisting obligation at the time of the conversion was admissible.

Patterson, J., dissenting in part.

Appeal from Trial Term, New York County.

Action by Robert D. Vroom against Russell Sage. From a judgment for plaintiff, defendant appeals. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PAT-TERSON, INGRAHAM, and LAUGHLIN, JJ.

Geo. W. Wickersham, for appellant.

Henry D. Hotchkiss, for respondent.

INGRAHAM, J. This action is, in form, an action for the conversion by the defendant of certain rights or privileges evidenced by certain written instruments which gave to the plaintiff the ri⸱⸱ to call from or deliver to the defendant certain specified stocks at certain fixed prices. These instruments were 11 in number, and were similar in form, except the date, the name of the stock, and the price and time during which they were to run. One of these instruments was as follows:

"New York, April 12, 1901.

"For value received, the bearer may deliver me, or call on me, on one day's notice except last day when notice is not required, One hundred (100) shares of the stock of the Chicago, Rock Island & Pac. Ry. Company, at One hundred and forty (140) per cent., if Put, or at One hundred and sixty (160) per cent., if called, any time in four (4) months from date.

"All dividends for which transfer books close during said time, go with the stock.

"Expires: 1:45 o'clock p. m.　　　　　Russell Sage."

The complaint alleges that the defendant negotiated and delivered these instruments for value, and that prior to the 9th of May, 1901, the said instruments were purchased by the plaintiff, who on the said day was the owner and holder thereof, and entitled to exercise all the privileges conferred by the said instruments upon such owner, and that the said several instruments were on that day of the value of $25,000. There was evidence that these stock privileges were issued in large numbers by the defendant and others engaged in business in New York, and that for many years they had been bought and sold as property in Wall street; that they passed by delivery, and were recognized as property subject to purchase and sale, and the holder of the privilege was recognized as entitled to enforce it. This evidence of the character of these instruments and the rights secured by them was not at all disputed by the defendant. While not negotiable, these instruments would seem to have been given by those dealing in them certain characteristics of transferability, by virtue of which there was vested in the owner or holder of them a right to call for or deliver the stocks specified. The privilege to deliver to or call for the stocks was given to the bearer of the instrument, and a transfer of the instrument carried with it to the holder the right secured by it. That this right to call for or deliver the stocks secured by instruments of this character was dealt in and recognized as property is, I think, the conclusion to be drawn from this evidence; and, as this property was dependent upon the possession of the instruments themselves, it would seem to follow that a conversion of the instruments would be a conversion of the property right to call for or deliver the stock, and would entitle the owner of the instruments to maintain an action for conversion by one who wrongfully possessed them and refused to deliver them to the true owner on de-

mand. So far as this question as to the character of the instruments and the right secured by them to the holder is concerned, these instruments may, I think, be considered as like checks or promissory notes payable to the bearer, and thus passing from hand to hand without indorsement; and it is well settled, and not disputed, that an action for conversion of instruments of this kind can be maintained. Laverty v. Snethen, 68 N. Y. 522, 23 Am. Rep. 184. In Hynes v. Patterson, 95 N. Y. 1, the court say:

"The principle is well settled that, when a bill or note has been diverted from the object for which it was intended, an action will lie against the person who unlawfully converts the same, for the conversion thereof, or for money had and received by him."

It is insisted, however, that the evidence did not justify the finding that the defendant had converted these instruments. The evidence of the plaintiff is that prior to the 9th day of May, 1901, he had become the owner of these 11 privileges, under which he was entitled to call for or deliver these specified stocks to the defendant; that on that day there was a financial disturbance in New York, and the prices of various stocks, including those which were specified in these privileges, were subject to violent fluctuations; that in the morning these stocks had so depreciated in value that the plaintiff could have realized a profit if he had been able to purchase the stocks at the market price and deliver them to the defendant at the price named in the privileges; that he went to a broker and asked him if he would purchase some of the stocks on the defendant's privileges; that this broker declined to purchase such stocks, apparently upon the ground that he had enough to do to take care of his own stocks that day; that about 20 or 30 minutes after this application to the broker the plaintiff went to see the defendant. His testimony as to his interview with Mr. Sage is: That he said to Mr. Sage: "I have got a number of stock privileges here—eleven. What will you charge me to buy the stock against them?" Mr. Sage offered to do it for 2 per cent., to which the plaintiff replied, "All right; two per cent."—and handed the privileges to Mr. Sage. Mr. Sage, on looking at the papers, asked the price of the various stocks of an employé, and the employé said that the Rock Island stock was worth from 125 to 130. The plaintiff then said, "Buy 500 at 130." Mr. Sage said, "Missouri, Kansas & Texas 37, 39," whereupon the plaintiff said, "Buy 500 Texas at 39." Mr. Sage said that steel and common was from 26 to 28, when the plaintiff said, "Buy 100 steel at 28." That the plaintiff then left, leaving the privileges with Mr. Sage. That some time after this, and about a quarter to 1, the plaintiff returned to Mr. Sage's office, when Mr. Sage said to the plaintiff: "We bought your stocks for you. We bought 500 Rock Island at 155." The plaintiff replied: "What! against a bid of 140? If you made an error like that, close the stock out and give me my papers." The plaintiff then looked at the quotations of stock in the office of Mr. Sage, and said: "Rock Island is 55, and steel 78. Sell it out and give me my papers. I don't want any stock at 55 against a bid of 40—$1,500 loss." That all of the prices named by Mr. Sage as the

prices at which he had purchased the stock were much above the price which the plaintiff testified that he had authorized Mr. Sage to pay. Upon another demand for his papers, Mr. Sage said: "I am an honest man. I have been here forty years at this stand, and have always done things right." To which the plaintiff replied: "I don't question you about doing anything right. I don't want stocks at that price. Nobody would buy them at a loss of 115 per cent. difference from a put." To this Mr. Sage did not reply, and the plaintiff said: "Well, if you won't give me my papers, I will go to my lawyer and see if I can get them."

It is not disputed but that the defendant received these privileges, executed orders to purchase stock based upon them, applied the stock thus purchased upon his privileges, and insisted upon his right to do so under the authority which he claimed to have received from the plaintiff. He never did deliver or offer to deliver these privileges to the plaintiff, and upon the trial attempted to sustain his right to hold these privileges upon the ground that he had executed the plaintiff's orders, and was thus entitled to the privileges.

I think that upon this testimony there was a conversion by the defendant of the instruments delivered to him, and which he was only entitled to keep by carrying out the instructions of the plaintiff in regard to the purchase of the stock. The form of these instruments authorized the plaintiff to deliver to the defendant, Sage, certain stocks at a price named. The plaintiff delivered these privileges to the defendant with instructions to purchase the stocks at a certain price, and to apply the stocks thus purchased as a delivery to himself; and, if the stocks had been purchased at the price named by the plaintiff, and at which, upon the plaintiff's testimony, Sage was only to purchase the stocks, the defendant would have been indebted to the plaintiff for the difference between the cost of the stocks and the amount at which the defendant was bound to receive and pay for them. This order the defendant accepted, and there was imposed upon him an obligation to purchase the stocks at the price named by the plaintiff, or, if that was impossible, to return to the plaintiff these instruments. He did not purchase the stocks at the price named by the plaintiff, and thus the only condition upon which he was authorized to retain these instruments was not fulfilled. As soon as the plaintiff was informed of the price at which the defendant had purchased the stocks, he at once repudiated the purchase and asked for a return of the privileges, and to this the plaintiff was clearly entitled; and the refusal of defendant to deliver them when demanded was a conversion, and entitled the plaintiff to maintain an action for such conversion.

The defendant relies upon the principle that, where an agent parts with property intrusted to him for sale at a price less than that authorized, he is not liable for a conversion of the property, but only in an action on the case for misconduct. The principle upon which this rule is based is stated in Laverty v. Snethen, 68 N. Y. 522, 23 Am. Rep. 184, as follows:

"The distinction in the two classes of cases, I apprehend, is that in the latter the broker or agent did nothing with the property but what he was

authorized to do. He had a right to sell and deliver the property. He disobeyed instructions as to price only, and was liable for misconduct, but not for conversion of the property—a distinction which, in a practical sense, may seem technical, but it is founded probably upon the distinction between an unauthorized interference with the property itself and the avails or terms of sale."

In this case the instruments were delivered to the defendant, not for the purpose of sale or delivery, but that the rights assured by them should be extinguished by the delivery of the stock to the defendant, and that stock the defendant undertook to purchase at a price fixed by the agreement of the parties. The defendant did not purchase the stock as agreed. He assumed to purchase it at a price in excess of that at which he had agreed that it should be purchased, and, then, by a delivery of the stock so purchased to himself, assumed to extinguish the right of the plaintiff secured to him by the privileges. The purchase of this stock was not on account of the plaintiff, as it was a purchase not authorized by him, and therefore the right secured by the privileges was not affected, and these instruments, that had been deposited with the defendant for a limited and specific purpose, and which, by the failure or impossibility of the defendant to carry out the plaintiff's instructions, was not accomplished, were the property of the plaintiff, and he was entitled to their possession. The authority given to the defendant to use these privileges was limited by the instructions given by the plaintiff and accepted by the defendant for the purchase of the stock that was to be used in extinguishing the obligations created by them. The defendant had no authority to use these privileges in any way except to purchase the stock at the price specified by the plaintiff, and extinguish the privileges by the receipt of the stock so purchased. His authority over the privileges was thus limited; and, as was said in Hynes v. Patterson, 95 N. Y. 1:

"The proof shows that the notes were made for a specific purpose, and that they were received by the defendants' testator with full knowledge of that fact, and as the custodian thereof, under the agreement already stated. He, having allowed them to be diverted from the purpose intended, became liable in damages for the conversion of the same. The principle is well settled that, when a bill or note has been diverted from the object for which it was intended, an action will lie against the person who unlawfully diverts the same, for the conversion thereof, or for money had and received by him. The right of the defendants' testator to the notes being for a particular object, the disposition made of same was without authority, and not for the purpose for which they were created."

I think, therefore, that, upon the plaintiff's testimony, there was a conversion of the instruments by the defendant.

The next and serious question in this case is as to the measure of damages, and the competency of certain evidence introduced by the plaintiff. As before stated, these instruments in themselves had acquired, by virtue of the general usage in Wall street, a specific property. They were transferred from hand to hand for value, as other property of this kind, and they had been in this way acquired by the plaintiff. He owned the instruments and was entitled to their possession when he made the demand on the evening of May 9th, and was entitled to recover the value of the instruments at the time of the conversion, and has brought this action to recover that value. These instruments having

a value at the time, the question was then presented as to the evidence competent to prove that value. The plaintiff's testimony tended to show that on that day, and for several succeeding days, in consequence of the peculiar conditions existing in financial circles, caused by the violent depreciation in the value of securities, there was no market for these privileges; that there were no privileges at that time for sale, and therefore there was no way of establishing a market value. Necessarily a value of this kind depends largely upon the condition of the market for the securities which are covered by the privileges, and the prices at which they can be bought and sold; and the amount that can be realized upon privileges of that kind necessarily varies from day to day, depending upon the fluctuation in the market in the price of securities and the existing conditions. Upon the plaintiff's testimony that, in consequence of the existing conditions, no privileges were on the market for sale, and it was impossible, therefore, to fix a market value, the plaintiff offered evidence of experts who were dealers in privileges of this kind, and had dealt in them for many years, as to what the privileges were actually worth. This was objected to by the defendant, and this exception, I think, presents the serious question in this case. The measure of the plaintiff's damages was the value of the plaintiff's property at the time of the conversion. There was no market value for that property. In what way, then, could the plaintiff prove the actual value of the property converted, at the time of the conversion? I can see no other way, except to prove what the property was actually worth, considering the conditions then existing, by means of experts who were in the habit of dealing in this species of property, and familiar with its value. Undoubtedly the conditions were exceptional. There had been a violent fall in stocks, with a partial recovery in the afternoon of May 9th. No one could tell what would be the subsequent course of the stock market—whether the improvement would be sustained and continued, or whether it would be followed by a further fall in prices. The jury were required, in ascertaining the value of these instruments at the time of the conversion, to determine the value, considering the conditions that existed, and the amount which would compensate the plaintiff for the refusal of the defendant to deliver to him these instruments at the time of his demand. The subsequent fluctuation in the price of stocks would certainly not indicate what was the value of the instruments at the time of the conversion. Certainly, if stocks had again violently depreciated, so as to have enabled the plaintiff to purchase the stocks and tender them at a price which would realize a large profit, the defendant could justly object to such testimony as showing the value at the time of conversion, as at that time it was impossible to determine the future course of the market. It seems to me that the only method, then, of ascertaining the value of the property converted—there being no market value—was by the testimony of experts as to its actual value as a subsisting obligation at the time of conversion; and this, I think, is sustained by the authorities. There is no question as to the absolute solvency of the defendant, and it must be assumed, in determining the question, that the defendant was willing and able to carry out his contracts. Nor was the property converted a chose in action which entitled the holder to recover a certain sum of money. Such an

instrument depending solely upon the solvency of the parties liable thereon, the measure of damages, in the absence of proof of insolvency of the parties, is the amount secured to be paid by the instrument.    Nor is this a case where, as in Ferguson v. Hubbell, 97 N. Y. 507, 49 Am. Rep. 544, and Reed v. McConnell, 101 N. Y. 270, 4 N. E. 718, the facts of the case could be stated and placed before the court and jury, and from them could be drawn the inferences from which the amount of damages could be ascertained.    Certainly neither the court nor the jury could, from a mere statement of the existing conditions, determine the value of the privileges.    In considering this question, we must bear in mind that the question is the value of the property converted, not the damages sustained by the breach of a contract.    In the case of conversion, where the measure of damages is the value of the property converted, the general rule is:

"When the property has a market value, witnesses may testify thereto as a fact known and proved; but, when no such value exists, the opinions of witnesses are admitted."   Am. & Eng. Enc. of Law, vol. 12 (2d Ed.) 475.

In Mitchell v. Read, 84 N. Y. 556, the question to be determined was as to the value of certain leases of hotel property, which was the property of a copartnership.    Upon the trial there was proof of the net profits of the hotel during the copartnership, whereupon witnesses were called who were old hotel keepers and experienced in the business, and were asked a question which assumed the evidence in regard to the net profits of the hotel for the five years preceding the expiration of the copartnership, which was as follows:

"Can you state what was the value of the three new leases to which your attention has been called, extending from the 1st of May, 1871, onward, including the furniture and good will, as on the 1st of May, 1871, to the part-ners and Mitchell, or either of them, or at a sale at which these partners, or either of them, or any other person, would be entitled to bid?"

This was objected to, was admitted, and the defendant excepted. The court held that, as the defendant had done damage to the plaintiff's testator by bringing about a state of things, the one element of that damage was the diminution in the value to the testator of his interest in the property thus affected; that it was an element in the estimate of damage, what the property would have brought, had there gone with the sale of it the right to keep it on the same place in the same business; that, if the plaintiff's share was to be had by a sale of the joint assets, that good will must then be sold, or he would not have his share, and, to reach its full value, it must go with the lease of the place; that, because of existing conditions the leases could not be sold at the time other property was sold, it was proper to consider what would have been the value of both had they been sold together, and that, in an inquiry into the damages for having that right denied and refused, it was competent to ask how the sale of the leases with the good will would have affected the value of the leases; and that the evidence of these experts was competent.    In Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676, Mitchell v. Read is referred to as sustaining the competency of the opinions of the

witnesses as to the value of the leases, based upon certain facts assumed, and it is said that the rule as to opinion evidence was properly applied in that case. Wakeman v. Wheeler & Wilson Mfg. Co., and other cases where it has been held that the amount of damages sustained by a breach of a contract was not a question for expert testimony, do not apply where the question is as to the value of property converted. It has always been, so far as I know, competent to introduce evidence of experts as to the value of property at the time of the conversion, as it is only by means of such evidence, in the absence of a market price, that the value can be ascertained. Here the question is as to the value of this property at the time of conversion, and certainly no estimate of that value could be made from a mere statement of the conditions existing in Wall street on the 9th day of May, 1901, as no estimate, in the absence of expert testimony as to the value of the leases sold as a part of the property of a going hotel, could be ascertained, except from the opinion of witnesses who are familiar with property of that kind and its value. I think, therefore, that in this case, upon the question of the value of these instruments at the time of conversion, the only method by which that value could be ascertained was from the opinion of experts who had been for many years dealing in privileges of this kind, and who could testify as to what these privileges were worth at the time of conversion. The facts upon which the opinions were based were before the court and jury, and there was no evidence offered by the defendant which tended in any way to contradict the estimate of value placed upon these privileges by the plaintiff's witnesses. I think, therefore, that there was no error committed in receiving this testimony, and none which would justify a reversal of the judgment.

The judgment and order appealed from should be affirmed, with costs.

VAN BRUNT, P. J., and McLAUGHLIN and LAUGHLIN, JJ., concur. PATTERSON, J., dissents on the subject of the competency and sufficiency of the evidence as to damages.